1  Brian A. Sun (State Bar No. 089410)
   Yolanda Orozco (State Bar No. 90779)
2  Jolene D. Mate (State Bar No. 247480)
   Courtney R. Chavez (State Bar No. 251298)
3  basun@jonesday.com
   JONES DAY
4  555 South Flower Street
   Fiftieth Floor
5  Los Angeles, CA 90071-2300
   Telephone: (213) 489-3939
6  Facsimile: (213) 243-2539

7  Attorneys for Plaintiff

ORIGINAL

8                 UNITED STATES DISTRICT COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10                      SACV09- 1062 DOC (RNBx)

11 REZA KHADIVI,                          **COMPLAINT FOR:**

12            Plaintiff,                   **(1) BREACH OF WRITTEN CONTRACT**

13       v.                               **(2) BREACH OF ORAL CONTRACT**
                                          **(3) CONVERSION**
14 GLOBAL BENEFITS GROUP,                 **(4) FRAUDULENT**
   INC., a California Corporation,        **MISREPRESENTATION**
15 ANDREW THORBURN, and Does              **(5) NEGLIGENT**
   1 though 10,                           **MISREPRESENTATION**
16                                        **(6) INTERFERENCE WITH**
              Defendants.                 **BUSINESS CONTRACT**
17                                        **(7) INTENTIONAL INTERFERENCE**
18                                        **WITH PROSPECTIVE ECONOMIC**
19                                        **ADVANTAGE**
20                                        **(8) NEGLIGENT INTERFERENCE**
                                          **WITH PROSPECTIVE ECONOMIC**
21                                        **ADVANTAGE**
22                                        **(9) DEFAMATION**
23                                        **(10) FALSE LIGHT**
                                          **(11) UNFAIR BUSINESS**
24                                        **PRACTICES**
25                                        **(12) ABUSE OF PROCESS**
                                          **(13) INJUNCTIVE RELIEF**
26                                        **(14) DECLARATORY RELIEF**
27                                        **DEMAND FOR JURY TRIAL**
28

Plaintiff Reza Khadivi[1] files this complaint against Defendant Global

Benefits Group, Inc. ("GBG") and Defendant Andrew Thorburn (collectively

"Codefendants"), and demanding a trial by jury, alleges as follows:

## I.   **JURISDICTION AND VENUE**

1.     This Court has subject matter jurisdiction over all claims for relief
asserted herein pursuant to Article III, section 2 of the United States Constitution
and 28 U.S.C. section 1332 as this action involves a controversy between citizens
of the United States and a citizen of the United Kingdom.  In addition, the amount
in controversy exceeds $75,000, exclusive of interests and costs.

2.     Venue is proper within this judicial district pursuant to 28 U.S.C.
section 1391, subsections (b) and (c).

## II.   **THE PARTIES**

3.     Plaintiff Reza Khadivi is a citizen of the United Kingdom.
Mr. Khadivi has over twenty years of experience in the insurance industry as an
underwriter and has developed extensive knowledge in his field.  His primary job
function over those twenty years has been to design forms, contracts and
individualized insurance packages, and provide data analysis services as a
representative for reinsurance carriers.

4.     Defendant Global Benefits Group, Inc. is a corporation organized
under the laws of the State of Delaware and conducting business in the State of
California.  GBG maintains its principal place of business in Foothill Ranch,
California.  GBG markets and provides insurance products.

5.     Defendant Andrew Thorburn is a citizen of the United States of
America, residing in Orange County, California.  He is the current Chief Executive
Officer of GBG.

---

[1] Reza Khadivi is also known as Ray Khadivi.

LAI-3051360

COMPLAINT

## III. FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

### A. Mr. Khadivi's Role in the Reinsurance Business

6.     Mr. Khadivi began his long and reputable career in the insurance industry in 1981 as an underwriter, focusing on health, life and disability insurance for individuals and employees of corporate clients.

7.     Through his more than twenty years of experience as an underwriter, Mr. Khadivi maintains his specialty in student and medical insurance. His focus allowed him to hone his skills and become a well-respected underwriter in the United Kingdom, as well as other countries. Mr. Khadivi underwrites policies for businesses all over the world, including the United States, Indonesia, Thailand, China and the United Arab Emirates. He has worked with numerous other insurance broking companies ("insurance brokers"), such as HealthCare International Limited UK, Global Assurance Group Inc., FL, Freedom Healthnet Limited, UK, and InterGlobal Insurance Services (Asia) Limited ETC.

8.     Insurance companies provide insurance to cover a number of different types of risks including medical, life, accidental death and dismemberment, student, and disability. Reinsurance allows an insurance company to divide risk with other insurance companies and protects the insurance company in the event of a catastrophic loss.

9.     An insurance broker does not provide the insurance on a policy, but rather performs services in connection with providing insurance, such as marketing insurance products, developing policies and administrating insurance plans. As part of an agreement to provide insurance to insurance brokers' policyholders, insurance companies typically require a reinsurance binder.

10.     Underwriters are people who work for insurance companies or insurance brokers. Their job entails assessing the eligibility of a customer to

1   receive insurance products, and determining the terms and conditions for the

2   insurance policies.

3       11.   Generally, Mr. Khadivi accepts employment with insurance brokers

4   such as PWS Holdings ("PWS") as an underwriter for reinsurance.  In order to gain

5   the reinsurance companies' trust and obtain the authority to underwrite business on

6   their behalf, Mr. Khadivi devotes himself to working closely with and developing

7   relationships with reinsurance companies.

8       12.   As an underwriter, Mr. Khadivi focuses on locating reinsurance

9   protection for insurance brokers seeking to place insurance products with

10   policyholders.  An insurance broker who has marketed a plan to its policyholders

11   will contact insurance brokers, such as PWS, and employ the skills of an

12   underwriter, such as Mr. Khadivi, to obtain reinsurance for the insurance company

13   insuring the plan.

14       13.   Part of his job involves assessing the risks to reinsurance companies.

15   Ordinarily, the insurance company provides Mr. Khadivi with the census

16   information of the policyholders' employees.  This census information includes

17   data, such as gender, age, dependents, nationality, and the type of coverage the

18   policyholders are seeking.  Mr. Khadivi analyzes the data in order to determine the

19   statistical probability of loss based on the actual experience of large groups of

20   people.  Based on his analysis, he assesses whether a reinsurance carrier should

21   accept the policy.

22       14.   Once the risk assessments are complete and coverage is determined,

23   Mr. Khadivi also designs personalized packages for the policyholders.  The

24   personalized packages include policy forms for the insurance contracts and the

25   range of premiums to be paid by the policyholder.  Upon designing these

26   personalized packages, Mr. Khadivi provides them to the insurance company, who

27   in turn provide them to the insurance brokers who perform the marketing and

28

administration services of the insurance plan, and who have direct contact with the policyholders. GBG is such an insurance broker.

**B.    Mr. Khadivi's Professional Relationship with GBG and Personal Relationship with Mr. Thorburn**

15.    Between February 2001 and February 2004, Mr. Khadivi was employed at Glencairn Limited, an international insurance and reinsurance broker based in London, England ("Glencairn"), performing duties as an underwriter.

16.    In July 2002, Mr. Khadivi was the underwriter for a joint venture insurance carrier created by Glencairn and Goudse Schadeverzikeringen N.V. ("Goudse"), a Netherlands based insurance carrier. The joint venture established United Life & Health Insurance Co. Ltd. ("United Life"), based out of Guernsey.

17.    In 2003, while working at Glencairn, Paul Bus of Goudse introduced Mr. Khadivi to Robert Sass, then-CEO of GBG, and Mr. Thorburn, then-head of the GBG senior management team. During that time, GBG's business typically consisted of marketing insurance products to United States based individuals or groups whose employees or members were located outside their country of citizenship. Goudse was a medical insurance carrier that provided coverage for GBG's policyholders.

18.    Mr. Sass and Mr. Thorburn asked Mr. Khadivi to help assist in transitioning GBG's life, accidental death and dismemberment, and disability insurance business from Zurich Insurance Company to the newly formed United Life. The transition was completed in or around July 2003.

19.    In addition, GBG used the services of Mr. Khadivi and Glencairn to obtain reinsurance coverage for those policies transferred to United Life. From July 2003 to February 2004, Mr. Khadivi began to work closely with Codefendants, providing the underwriting services for GBG's medical and student insurance.

1   Another employee at Glencairn, John White, handled GBG's life, accidental death
2   and dismemberment, and disability policies.

3        20.    In working closely together on GBG business, Mr. Thorburn and
4   Mr. Khadivi developed a close professional and personal relationship.

5        21.    In or around February 2004, Mr. Khadivi left Glencairn to join PWS,
6   an insurance broker registered with Lloyd's of London, as Managing Director of
7   Accident and Health.

8        22.    While an employee of PWS, Mr. Khadivi performed the same
9   underwriting duties as he had in the past:  assessing risks, creating terms and
10  policies, and designing the forms for policyholders on behalf of reinsurers.

11       23.    In or around February 2004, Mr. Thorburn transferred GBG's business
12  to Mr. Khadivi at PWS, because Mr. Thorburn wanted to continue to utilize
13  Mr. Khadivi's expertise and experience in obtaining reinsurance coverage for
14  GBG's medical and student insurance policies.  Mr. White, who had handled
15  GBG's life, accidental death and dismemberment, and disability policies at
16  Glencairn, also followed Mr. Khadivi to PWS.

17       24.    Mr. Khadivi continued servicing GBG's policyholders as an
18  underwriter from around July 2004 until April 2008, further strengthening the
19  business relationship between Mr. Khadivi and Mr. Thorburn.

20       25.    As Mr. Khadivi and Mr. Thorburn continued to work closely together,
21  their friendship and personal relationship grew immensely.  They were often
22  together to develop business, and so began to include each other in their personal
23  lives as well, introducing each other to their families.  Mr. Khadivi often stayed at
24  Mr. Thorburn's house.  When visiting London, Mr. Thorburn spent most of his time
25  with Mr. Khadivi.  Mr. Thorburn discussed his desire that Mr. Khadivi one day
26  come to work for GBG.

27
28

**C.    Mr. Khadivi's Provides Personal, Professional Assistance to Mr. Thorburn**

26.    In addition to the PWS/ GBG relationship and the strong personal friendship they had formed, Mr. Khadivi and Mr. Thorburn began a separate business relationship.  Mr. Khadivi began helping Codefendants build their business by utilizing Mr. Khadivi's extensive contacts to facilitate and support GBG's growth.  Helping GBG grow also contributed to Mr. Khadivi's work with PWS because it increased GBG's business with PWS.

27.    In 2005, Mr. Thorburn told Mr. Khadivi about GBG's desire to purchase its own insurance company.  GBG had been historically unable to maintain a stable business relationship with an insurance company for longer than two to three years at a time.  Owning its own insurance company would bring more stability to GBG and allow it to address coverage issues directly with its policyholders.

28.    Around the same time, Charles Salvatori, owner of Gulf Insurance Limited of Trinidad, approached Mr. Khadivi for help in opening a new insurance company.

29.    Mr. Khadivi saw an opportunity to both establish the new insurance company for Mr. Salvatori and address Mr. Thorburn's desire of acquiring an insurance company to service GBG's policyholders.  Mr. Khadivi offered to set up Gulf Insurance PCC Limited of Guernsey, Mr. Salvatori's new insurance company. At the same time, he proposed setting up a subsidiary company, Insurance Without Borders ("IWB") to be owned by GBG.  Both GBG and Mr. Salvatori agreed to the formation of these entities as proposed by Mr. Khadivi.  In exchange for creating the subsidiary company for Mr. Thorburn, certain IWB policies would be reinsured by Gulf Insurance PCC Limited.

30.    In addition to helping GBG acquire its own insurance carrier, Mr. Khadivi also assisted Codefendants in increasing their profits.  Even with its

LAI-3051360
COMPLAINT

1   own insurance carrier, new GBG business required the participation of reinsurers.

2   Because of Mr. Khadivi's representation of reinsurers and contacts in the industry,

3   he often accompanied Mr. Thorburn in his efforts to expand GBG's presence

4   worldwide.

5         31.    As a result of Mr. Khadivi's introductions, GBG profited handsomely.

6   For example:

7

8      • In 2006, Mr. Khadivi helped Codefendants acquire a $2 million

9         block of business from Bob Pickerel, another individual

10        marketing insurance who was looking to sell his block of

11        premiums and client contacts.

12      • Mr. Khadivi assisted in the creation/ structuring of contracts

13        leading to the payment of $12 million in premiums from

14        Japanese-owned business Kamome Kyousai, resulting in

15        commissions in excess of $1 million for GBG in 2006.

16      • In 2007, Mr. Khadivi introduced Mr. Thorburn to ING Banking

17        and helped forge a business relationship wherein IWB, through

18        GBG, insured policyholders of ING Banking.

19      • In 2007, Mr. Khadivi again assisted GBG in its acquisition of a

20        $3.5 million premium block from Sagicor Life Inc., an

21        insurance carrier for whom Mr. Khadivi was authorized to

22        create reinsurance contracts.

23        32.    With Mr. Khadivi's assistance, GBG flourished, growing from a small

24   company with yearly premiums estimated at $5 million for the previous twenty

25   years, into a company taking in over $35 million.  GBG's commissions on these

26   premiums were approximately 32.5%.

27

28

**D.    Mr. Thorburn's Acquisition of a Controlling Stake in GBG**

33.    In or around September 2005, Mr. Sass, GBG's CEO and sole shareholder, told Mr. Thorburn that he wanted step down from his position and have Mr. Thorburn takeover the company.  Mr. Sass gave Mr. Thorburn until the end of December 2005 to buy GBG; otherwise, Mr. Sass would sell GBG to another purchaser.  At that time, Mr. Thorburn did not own any stock in GBG.

34.    Concerned about not having the necessary capital to purchase the requisite shares from Mr. Sass, Mr. Thorburn asked Mr. Khadivi for assistance in locating an individual or entity in a position to loan money for the purchase of GBG shares.

35.    Mr. Khadivi approached Mr. Salvatori, owner of Gulf Insurance PCC Limited, and proposed that Mr. Salvatori finance Mr. Thorburn's acquisition of GBG.  After Mr. Salvatori indicated his willingness to do so, Mr. Khadivi initially acted as an intermediary between Mr. Thorburn and Mr. Salvatori.

36.    In or around October 2005, Mr. Thorburn told Mr. Khadivi that should Mr. Salvatori finance Mr. Thorburn's acquisition of GBG's stock, Mr. Thorburn would give Mr. Khadivi 10% of the GBG equity purchased by Mr. Thorburn.  According to Mr. Thorburn, the equity interest would recognize Mr. Khadivi's hard work and assistance in helping Mr. Thorburn obtain financial support from Mr. Salvatori.

37.    On October 15, 2005, Mr. Thorburn memorialized this promise to Mr. Khadivi, indicating that Mr. Khadivi would receive (1) 10% of Mr. Thorburn's profit share in addition to 10% of any dividends or payments made to Mr. Thorburn from IWB; (2) 10% of the total GBG equity owned by Mr. Thorburn; and (3) in the event of a sale of GBG, 10% of the proceeds received from the transaction.

38.    In January 2006, Mr. Khadivi learned that Mr. Thorburn had reached an agreement with Mr. Salvatori.  Upon information and belief, the agreement provided that Mr. Salvatori would loan Mr. Thorburn $4 million for the purchase of

80% of GBG's equity.  In case of default, a convertible note issued to Mr. Salvatori would convert into common stock and allow Mr. Salvatori to assume full management control of GBG.  In addition, Mr. Salvatori held the right of first refusal on any offer Mr. Thorburn received for the sale of GBG.

39.     In January 2006, Mr. Thorburn purchased an 80% equity interest in GBG.

40.     Upon information and belief, Mr. Salvatori sent the $4 million payment for the 80% equity interest to be purchased by Mr. Thorburn directly to an offshore Liechtenstein bank account controlled by Mr. Sass.[2]  Direct payment to Mr. Sass was a condition to the agreement between Mr. Salvatori and Mr. Thorburn.

41.     On or about January 19, 2006, Mr. Thorburn gave 8% of GBG's shares to Mr. Khadivi, thereby acknowledging Mr. Khadivi's assistance in arranging the financing provided by Mr. Salvatori.  A true and correct copy of Mr. Khadivi's GBG share certificate is attached hereto as Exhibit 1.  The 8% equity interest was 10% of the total equity purchased by Mr. Thorburn in the transaction.  As a result, Mr. Thorburn held 72% of GBG's equity, Ms. Sass held 20% of GBG's equity, and Mr. Khadivi held 8% of GBG's equity.

42.     After receiving the GBG share certificate, Mr. Khadivi disclosed the ownership of his stock to his employer, PWS.

**E.    Codefendants' Efforts to Develop Business in China**

43.     Mr. Khadivi traveled with Mr. Thorburn to China in March 2006 and November 2007, where he met Patrick Hopkins and Celine Zhang.  At that time, because GBG had no permanent presence in China, Ms. Zhang's company, Shanghai Tai Kai, worked with GBG.

---

[2] Upon information and belief, the deal was structured as a $4 million loan to GBG.  This loan was allegedly for the purpose of paying off a termination agreement with an offshore administrative services company in Liechtenstein, called TPA Establishment.

44.     While in China, the four met with China Continent and Property & Casualty Insurance Company Ltd. ("CCIC").

45.     Under Chinese law, it is illegal for GBG to conduct its business unless it uses a locally licensed insurance company.  CCIC had been identified as an insurance company regulated and licensed by the Chinese insurance authorities that would work with GBG.

46.     It was Mr. Thorburn who requested Mr. Khadivi's presence at the China meetings with CCIC.  During these meetings, the participants discussed policies, coverage, forms and rates, business, premium and claim issues, and the reinsurance contract.  GBG became a designated service provider for CCIC. Mr. Khadivi represented potential reinsurance carriers for policies to be sold by CCIC.

**F.     Mr. Thorburn Offers Mr. Khadivi a Job with GBG**

47.     As early as 2005, Mr. Thorburn discussed the possibility of Mr. Khadivi joining GBG.  The idea of developing a European affiliate of GBG that could provide underwriting services similar to PWS, Global Benefits Group Europe ("GBE"), became part of that discussion in 2006.

48.     In the Fall of 2007, it became clear that Mr. Khadivi's employer, PWS, was facing financial difficulties and searching for an entity to acquire its business. During this time, PWS and Thompson Heath & Bond Ltd. ("Thompson Heath"), an independent insurance broker, were discussing a possible merger.  However, it appeared that the PWS/ Thompson Heath transaction would fall through.  Near the end of 2007, Mr. Khadivi feared that PWS would shut down and he would lose his job.

49.     Mr. Thorburn told Mr. Khadivi that if PWS shut down, GBG would want to find a place that Mr. Khadivi and his staff could continue to perform their services for GBG.  Mr. Thorburn reinitiated talks about developing GBG's

1   European affiliate, GBE.  Worried about the future of his employment, Mr. Khadivi

2   discussed the possibilities with Mr. Thorburn, and they began to plan the creation

3   and opening of GBE.

4        50.    Pursuant to their discussions about GBE's establishment and because

5   Mr. Thorburn was having difficulty opening a corporate account in the U.K., in

6   November and December 2007, Mr. Thorburn directed GBG to wire approximately

7   $500,000 into a New York bank account opened by Mr. Khadivi for the specific

8   purpose of establishing the GBE office in London.

9        51.    Mr. Khadivi immediately began establishing the GBE office in

10  London.  He used a portion of the $500,000 to rent office space, procure IT

11  equipment and licenses, and begin creating the basic corporate structure for GBE.

12       52.    Even though Mr. Khadivi had decided to assist Mr. Thorburn with

13  setting up GBE, he grew increasingly reluctant to involve himself with GBG due to

14  his growing concerns about certain business practices employed by GBG.  These

15  concerns included:

16

17       •     That GBG was possibly deriving a financial benefit through the

18             nonpayment or underpayment of taxes.  This suspicion was fueled by

19             GBG's failure to follow normal accounting procedures and the use of

20             offshore bank accounts.

21       •     Mr. Khadivi's questioning of GBG's claimed business rating,

22             purportedly A or A- by global credit rating agency A.M. Best.

23       •     Mr. Thorburn's disclosure to Mr. Khadivi that GBG had been

24             investigated in the United States for providing insurance from an

25             unlicensed carrier.

26

27

28

LAI-3051360

- 12 -

COMPLAINT

## G.   Mr. Khadivi Joins Thompson Heath & Bond

53.   By the end of the year, Mr. Khadivi still believed that the PWS/ Thompson Heath merger would fall through.  Nevertheless, as Mr. Khadivi was working on GBE's development, on or about January 8, 2008, Thompson Heath made him a job offer in contemplation of its pending merger with PWS.

54.   In connection with the offer, Mr. Khadivi was presented with an Irrevocable Promissory Note (the "Promissory Note").  A true and correct copy of the Promissory Note is attached hereto as Exhibit 2.  Though the merger had not yet been completed, Thompson Heath gave Mr. Khadivi the Promissory Note to provide incentives for achievements and his continued employment.  Under the Thompson Heath offer, Mr. Khadivi would receive the following:  (1) Two PWS profit-share payments of a minimum of £50,000 each, paid on March 31, 2008 and September 30, 2008; (2) an initial annual payment of £412,600 on June 30, 2008; and (3) the subsequent annual payments, starting June 30, 2009 and continuing thereafter until June 30, 2012.

55.   The issuance of the Promissory Note depended on the completion of Thompson Heath's acquisition of PWS and Mr. Khadivi's acceptance of employment with Thompson Heath.

56.   After receiving Thompson Heath's offer, Mr. Khadivi told Mr. Thorburn about the offer and that he was inclined to accept.  At that time, Mr. Thorburn said that this change in plan was not a problem and supported Mr. Khadivi's decision to remain with PWS/ Thompson Heath.

57.   Because he agreed to remain with PWS/ Thompson Heath instead of joining GBG, Mr. Khadivi ceased his active participation in the development of GBE.

58.   On or around January 25, 2008, Thompson Heath announced that its acquisition of PWS was complete.  Mr. Khadivi remained an employee of the new entity PWS/ Thompson Heath.

1    59.    Mr. Khadivi continued servicing GBG's medical and student

2    policyholders as an underwriter for PWS/ Thompson Heath from January 2008 to

3    July 2008, using his expertise and experience to the benefit of GBG and his other

4    PWS/ Thompson Heath clients.

5    60.    Thompson Heath paid Mr. Khadivi his first bonus payment of £53,000

6    in or around April 2008.

7    **H.    Mr. Thorburn ends GBG's Relationship with PWS/ Thompson Heath**

8    61.    Beginning February 2008, Mr. Thorburn's attitude towards

9    Mr. Khadivi and PWS/ Thompson Heath began to materially change.

10   Mr. Thorburn began discussions with Willis Reinsurance ("Willis"), an

11   international insurance broker, about possibly transferring the GBG business from

12   PWS.  Mr. Thorburn told Mr. Khadivi that Willis would perform the same

13   functions as PWS for lower margins and higher commissions to GBG.

14   62.    Mr. Thorburn commented to Mr. Khadivi about Willis on a weekly

15   basis, wherein Mr. Thorburn said that Willis would be able to cover a higher ratio

16   of loss without impacting GBG's commissions.

17   63.    Mr. Thorburn's repeated comments regarding Willis and his expressed

18   dissatisfaction with PWS/ Thompson Heath became a growing concern for

19   Mr. Khadivi.  At an industry meeting in New York in February 2008, Mr. Khadivi

20   met with Mr. Thorburn, along with GBG employee Ed Zutler and PWS employee

21   John White,[3] and reiterated his decision to remain with PWS/ Thompson Heath.

22   64.    During this meeting, Mr. Thorburn became very hostile and demanded

23   that Mr. Khadivi resign and join GBE.  Mr. Khadivi declined to do so.

24   65.    Although Mr. Khadivi did not want to disappoint his friend, he

25   believed that joining GBG would be a bad idea for his professional career.  His

26   concerns about becoming involved with what he believed to be GBG's problematic

27

28   [3] Ed Zutler and John White are currently employees of GBG and/or GBE.

1  business practices—namely possible tax irregularities, the use of offshore bank

2  accounts, failure to follow normal accounting procedures, improper use of

3  insurance ratings, and potential non-compliance with local regulatory agencies—led

4  him to decline Mr. Thorburn's offer.

5       66.    After Mr. Khadivi's refusal to resign from PWS/ Thompson Heath,

6  Mr. Thorburn's contact with Mr. Khadivi became sporadic.

7  **I.**     **The Plan to Disparage Mr. Khadivi and Destroy Him Professionally**

8

9       67.    Knowing that Mr. Khadivi was no longer of any business use to GBG,

10 Mr. Thorburn realized he needed to regain the valuable equity stake Mr. Khadivi

11 held in GBG in order expand GBG and make GBG more desirable for potential

12 resale.  In order to reach these goals, Codefendants set in motion their plan to:

13     •    Use Mr. Thorburn's close friendship with Mr. Khadivi to

14 fraudulently convince him to convey the GBG shares back to

15 Mr. Thorburn;

16     •    Engage in a calculated plan to disparage Mr. Khadivi and

17 damage his reputation; and

18     •    Ensure that Mr. Khadivi would not be able to utilize his

19 experience and expertise performing underwriting services for

20 Shanghai Tai Kai, Mr. Hopkins or Ms. Zhang, because Codefendants

21 feared that Mr. Khadivi would assist Mr. Hopkins and Ms. Zhang who

22 Codefendants perceived as potential competitors to GBG in China.

23

24      68.    A little more than a month after the New York meeting, on or about

25 April 1, 2008, Mr. Thorburn traveled to London to meet with Stephen Card, CEO

26 of PWS/ Thompson Heath, and Mr. Khadivi.

27      69.    During this meeting, Mr. Thorburn expressed his appreciation for

28 Mr. Khadivi's significant assistance to GBG over the many years and recognized

1   that GBG would not have enjoyed substantial growth without Mr. Khadivi's

2   support.

3        70.    However, Mr. Thorburn said that GBG was immediately parting

4   company and taking its business to Willis.

5        71.    In addition to terminating the relationship, GBG offered positions to

6   Mr. White and Paul Horden with GBE.  Mr. White and Mr. Horden resigned from

7   PWS/ Thompson Heath on April 1, 2008 and accepted the positions with GBE.

8   **J.    Mr. Thorburn Induces Mr. Khadivi to Relinquish his GBG Shares**

9        72.    At the end of the meeting, Mr. Thorburn talked to Mr. Khadivi alone

10  about repurchasing the 8% in GBG shares Mr. Khadivi received in 2006.

11  Mr. Thorburn indicated that GBG needed the shares in order to refinance GBG and

12  acquire Gulf Insurance PCC Limited.[4]

13       73.    Mr. Thorburn indicated that while he wanted to repurchase

14  Mr. Khadivi's shares, he could not give Mr. Khadivi their full value.  Mr. Thorburn

15  offered Mr. Khadivi roughly $1 million dollars in exchange for his GBG shares,

16  under the following terms:

17

18       •    As an initial payment, Mr. Khadivi would keep the unused

19            portion of the $500,000 deposited for the development of GBE;

20       •    Codefendants would pay Mr. Khadivi the remaining $600,000 in

21            60 monthly installments.

22       74.    Mr. Thorburn explained that the monthly installment payment terms

23  would assist GBG with its cash flow.

24       75.    Additionally, according to Mr. Thorburn, it would be more tax efficient

25  if GBG paid for Mr. Thorburn's shares by structuring the payments as if they were

26  made in exchange for GBE's set up expenses.  Thus, the terms of the monthly

27  _____

28  [4] The transaction was completed late in 2008.  Gulf Insurance PCC Limited
    was renamed GBG Insurance Company Limited.

1   payments were set out in a "Consulting Agreement," and entered into on or about

2   April 16, 2008.  A true and correct copy of the Consulting Agreement is attached

3   hereto as Exhibit 3.

4         76.    The Consulting Agreement purports to have Mr. Khadivi to provide

5   consulting services to assist GBG in setting up GBE.  Additionally, the parties

6   agreed to "refrain from any disparaging or derogatory statements regarding the

7   other," and that the "details of their business cooperation" were "confidential and

8   neither party shall share any such details with any individual or entity."

9         77.    As consideration for these promises, Codefendants promised that the

10   $600,000 payments were "non-cancelable, irrevocable and unconditional," "not

11   contingent on any specific performance" by Mr. Khadivi, and its terms were

12   "binding upon the successors and assigns of GBG."  That language was consistent

13   with Mr. Khadivi's understanding and Mr. Thorburn's representations that

14   Mr. Khadivi need not perform any services in order to receive the monthly

15   payments.

16         78.    Mr. Khadivi believed the offer was exceptionally low, because

17   Mr. Thorburn said that sometime in 2007, GBG had been appraised at

18   approximately $24 million.

19         79.    Nevertheless, because he still considered Mr. Thorburn a close,

20   personal friend—Mr. Thorburn was going to perform a reading at Mr. Khadivi's

21   wedding in less than two months—Mr. Khadivi accepted Codefendants' offer to

22   resell his shares for approximately $1 million.

23         80.    Mr. Khadivi agreed to the monthly payment terms because he believed

24   that would help GBG.  He relied on Codefendants' promises to make the monthly

25   payments and further relied upon the promises made by Codefendants that the

26   agreement was irrevocable, not contingent upon any performance by Mr. Khadivi,

27   and binding upon GBG.

28

81. Mr. Khadivi signed the Consulting Agreement on or about April 16, 2008, and returned the GBG share certificate to Codefendants.

82. Codefendants made the first two payments totaling $33,332 in accordance with the terms described in the Consulting Agreement on or around April 30, 2008, and May 29, 2008.

83. GBG did not make any additional payments after May 29, 2008. It soon became apparent that Codefendants never intended on making the payments as promised.

## K. Mr. Khadivi's Employment is Terminated by PWS/ Thompson Heath

84. On or about May 16, 2008, Mr. Thorburn attended Mr. Khadivi's wedding, and gave the honorary reading at the ceremony. The following day, Mr. Khadivi left London for a two week honeymoon. Immediately after that, he attended two conferences in Curacao and Barcelona. Mr. Khadivi did not return to the PWS/ Thompson Heath office until June 16, 2008.

85. Upon information and belief, on or about May 31, 2008—about two weeks after Mr. Khadivi's wedding—Mr. Thorburn met with Mr. Hopkins and Mr. Sass in Vienna, Austria. At this meeting, Mr. Thorburn made disparaging and harmful remarks directed against Mr. Khadivi's integrity and reputation, telling Mr. Hopkins that Mr. Khadivi could not be trusted. Mr. Thorburn advised Mr. Hopkins to cease working with Mr. Khadivi.

86. Upon information and belief, and unknown to Mr. Khadivi who at the time was away on his honeymoon and traveling for business, Mr. Thorburn again approached Mr. Card, in or around June 2008.

87. Upon his return, Mr. Khadivi was informed by Mr. Card that Mr. Thorburn had made multiple allegations against Mr. Khadivi, attacking his credibility and accusing Mr. Khadivi of violating his employment contract with PWS/ Thompson Heath.

88.     To prove his allegations, Mr. Thorburn provided PWS/ Thompson Heath with a copy of the Consulting Agreement.  As a result, disciplinary hearings were initiated against Mr. Khadivi.  At the disciplinary hearing, PWS/ Thompson Heath talked to Mr. Khadivi about the Consulting Agreement.  Mr. Khadivi explained that the Consulting Agreement was created for the repurchase of the 8% equity by Mr. Thorburn.

89.     After hearing Mr. Khadivi's response to Codefendants' allegations, PWS/ Thompson Heath acknowledged that Mr. Khadivi may well have been the victim of a "stitch up."[5]  Regardless, his employment was terminated on or around July 23, 2008, because of the Consulting Agreement and its alleged conflict with Mr. Khadivi's employment with PWS/ Thompson Heath.

90.     Three days later, Codefendants issued a letter to Mr. Khadivi cancelling all agreements in full, including the Consulting Agreement, and expressly stating that there was no business relationship or obligation between Mr. Khadivi and GBG.  In addition, GBG demanded the return of money from the approximately $500,000 of GBE's start up funds and the two wire transfers totaling $33,332.

91.     Confused by Mr. Thorburn's actions, and angered over the non-payment for his GBG shares, Mr. Khadivi attempted several times to contact Codefendants and enforce the agreement, but to no avail.

**FIRST CLAIM FOR RELIEF**
**(Breach of Written Contract against Codefendants)**

92.     Mr. Khadivi repeats and realleges the allegations contained in paragraphs 1 through 91 above as though fully set forth herein.

93.     In or around April 2008, Codefendants offered to purchase 8% of GBG shares owned by Mr. Khadivi.

---

[5] British slang for "set up."

LAI-3051360

- 19 -

COMPLAINT

94.   In exchange for Mr. Khadivi's GBG shares, Codefendants offered that Mr. Khadivi would keep the remaining unused portion of the $500,000 of GBE's start up capital as an initial payment, and GBG would pay an additional $600,000 in 60 monthly installments.

95.   The terms of the monthly payments were memorialized in the Consulting Agreement.  Mr. Khadivi accepted Codefendants' offer, and the parties signed the Consulting Agreement on or about April 16, 2008.

96.   Mr. Khadivi has honored all material terms and conditions of the Consulting Agreement.

97.   Codefendants paid only two of the monthly installments to Mr. Khadivi in an amount totaling $33,332.  Codefendants have not made any additional payments.  Codefendants failed to perform because they did not pay Mr. Khadivi the remaining $566,668 in monthly installments.

98.   As a direct result of Codefendants' failure to perform, Mr. Khadivi suffered damages in an amount not less than $566,668.

**SECOND CLAIM FOR RELIEF**
**(Breach of Oral Contract against Codefendants)**

99.   Mr. Khadivi repeats and realleges the allegations contained in paragraphs 1 through 91 above as though fully set forth herein.

100.  In or around April 2008, Codefendants offered to purchase 8% of GBG shares owned by Mr. Khadivi.

101.  In exchange for Mr. Khadivi's GBG shares, Codefendants offered that Mr. Khadivi would keep the remaining unused portion of the $500,000 of GBE's start up capital as an initial payment, and Codefendants would pay an additional $600,000 in 60 monthly installments.

102.  Mr. Khadivi accepted Codefendants' offer.

103.  Mr. Khadivi has honored all material terms and conditions of the parties' oral agreement.

104.   Codefendants paid only two installments to Mr. Khadivi in an amount totaling $33,332.  Codefendants have not made any additional payments. Codefendants failed to perform because they did not pay Mr. Khadivi the remaining $566,668 in monthly installments.

105.   As a direct result of Codefendants' failure to perform, Mr. Khadivi suffered damages in an amount not less than $566,668.

### THIRD CLAIM FOR RELIEF
#### (Conversion against Codefendants)

106.   Mr. Khadivi repeats and realleges the allegations contained in paragraphs 1 through 91 above as though fully set forth herein.

107.   Through false and fraudulent statements, Codefendants persuaded Mr. Khadivi to turn over his GBG share certificate to Codefendants under the guise that they would make monthly payments totaling $600,000 over 60 months.

108.   Codefendants did not intend to make full payment for the GBG shares to Mr. Khadivi.

109.   In or around July 2008, Mr. Khadivi contacted Codefendants requesting payment for the GBG shares.  However, Codefendants did not respond to Mr. Khadivi's request.

110.   As a result of Codefendants' conversion, Mr. Khadivi suffered damages in an amount that shall be proven at trial.

### FOURTH CLAIM FOR RELIEF
#### (Fraudulent Misrepresentation against Codefendants)

111.   Mr. Khadivi repeats and realleges the allegations contained in paragraphs 1 through 91 above as though fully set forth herein.

112.   In February 2008, Mr. Thorburn became extremely angry and his behavior erratic after Mr. Khadivi declined Mr. Thorburn's offer of employment with GBG.

1    113.  In April 2008, Codefendants offered to purchase the 8% of GBG shares

2    owned by Mr. Khadivi.

3    114.  In April 2008, Codefendants induced Mr. Khadivi into signing the

4    Consulting Agreement.  In exchange for Mr. Khadivi's GBG shares, Codefendants

5    offered that Mr. Khadivi keep the remaining balance of the $500,000 from GBE's

6    start up costs as an initial payment and Codefendants would pay an additional

7    $600,000 in 60 monthly installments.

8    115.  Codefendants had no intention of paying the amount offered for the

9    GBG shares.

10   116.  Codefendants promised that the $600,000 payments were "non-

11   cancelable, irrevocable and unconditional," "not contingent on any specific

12   performance" by Mr. Khadivi, and its terms were "binding upon the successors and

13   assigns of GBG."  As Codefendants believed they could cancel the contract at any

14   time, Codefendants believed these statements to be false when they entered into the

15   agreement.  Codefendants made the statements in order to induce Mr. Khadivi's

16   agreement to return his GBG shares.

17   117.  Mr. Khadivi relied upon Codefendants' promises, and accepted

18   Codefendants' offer.

19   118.  Mr. Khadivi signed the Consulting Agreement, and returned the GBG

20   share certificate.

21   119.  As a result of Mr. Khadivi's reliance on Codefendants' fraudulent

22   misrepresentation, Mr. Khadivi suffered damages in an amount not less than

23   $566,668.  In addition, Mr. Khadivi requests punitive damages in an amount to be

24   determined at trial.

25                        **FIFTH CLAIM FOR RELIEF**
26              **(Negligent Misrepresentation against Codefendants)**

27   120.  Mr. Khadivi repeats and realleges the allegations contained in

28   paragraphs 1 through 91 above as though fully set forth herein.

LAI-3051360
                                    - 22 -                        COMPLAINT

1      121.  In April 2008, Codefendants offered to purchase the 8% of GBG shares

2  owned by Mr. Khadivi.

3      122.  In exchange for Mr. Khadivi's GBG shares, Codefendants offered that

4  Mr. Khadivi keep the remaining balance of the $500,000 from GBE's start up costs

5  as an initial payment and Codefendants would pay an additional $600,000 in 60

6  monthly installments.

7      123.  Codefendants promised that the $600,000 payments were "non-

8  cancelable, irrevocable and unconditional," "not contingent on any specific

9  performance" by Mr. Khadivi, and its terms were "binding upon the successors and

10  assigns of GBG."   Codefendants made these assertions in a manner not warranted

11  based upon the information possessed by Codefendants at the time of making the

12  assertion.

13      124.  Codefendants made the statements in order to induce Mr. Khadivi's

14  agreement to return his shares.

15      125.  Mr. Khadivi relied upon Codefendants' promises, and accepted the

16  offer.  Mr. Khadivi signed the Consulting Agreement and returned the GBG share

17  certificate to Codefendants.

18      126.  As a result of Mr. Khadivi's reliance on Codefendants' negligent

19  misrepresentations, Mr. Khadivi suffered damages in an amount not less than

20  $566,668.

### SIXTH CLAIM FOR RELIEF
**(Interference with Business Contract against Codefendants)**

23      127.  Mr. Khadivi repeats and realleges the allegations contained in

24  paragraphs 1 through 91 above as though fully set forth herein.

25      128.  In January 2008, PWS/ Thompson Heath gave Mr. Khadivi a

26  Promissory Note.  In the Promissory Note, PWS/ Thompson Heath offered

27  Mr. Khadivi bonuses in exchange for his continued employment with PWS/

28  Thompson Heath.

129.   Mr. Khadivi told Codefendants that PWS/ Thompson Heath gave Mr. Khadivi the Promissory Note, and that he would continue working with PWS/ Thompson Heath so that he could collect the bonuses.

130.   In April 2008, Codefendants induced Mr. Khadivi into signing the Consulting Agreement.

131.   In or around June 2008, Codefendants alleged to PWS/ Thompson Heath that Mr. Khadivi violated his employment contract by signing the Consulting Agreement with Codefendant.  By disclosing this information, Codefendants intended to prevent Mr. Khadivi's continued employment with PWS/ Thompson Heath.  Codefendants knew with substantial certainty that if they disclosed the Consulting Agreement to PWS/ Thompson, Mr. Khadivi would no longer be employed.

132.   Because of Codefendants' conduct, PWS/ Thompson Heath terminated Mr. Khadivi's employment contract and did not pay Mr. Khadivi his bonuses.

133.   As a result, Mr. Khadivi suffered damages in an amount that shall be proven at trial.  In addition, Mr. Khadivi requests punitive damages in an amount to be determined at trial.

## SEVENTH CLAIM FOR RELIEF
### (Intentional Interference with Prospective Economic Advantage against Codefendants)

134.   Mr. Khadivi repeats and realleges the allegations contained in paragraphs 1 through 91 above as though fully set forth herein.

135.   In January 2008, PWS/ Thompson Heath gave Mr. Khadivi a Promissory Note.  In the Promissory Note, PWS/ Thompson Heath offered Mr. Khadivi bonuses in exchange for his continued employment with PWS/ Thompson Heath.

1   136.   Mr. Khadivi told Mr. Thorburn that PWS/ Thompson Heath gave him

2   the Promissory Note, and that Mr. Khadivi would continue working with PWS/

3   Thompson Heath so that he could collect the bonuses.

4   137.   In February 2008, Mr. Thorburn became extremely angry and his

5   behavior erratic after Mr. Khadivi declined his offer of employment with GBG.

6   138.   In April 2008, Codefendants induced Mr. Khadivi into signing the

7   Consulting Agreement.

8   139.   In June 2008, Codefendants made defamatory statements about

9   Mr. Khadivi to PWS/ Thompson Heath.  Codefendants provided copies of the

10   Consulting Agreement to PWS/ Thompson Heath to prove that Mr. Khadivi

11   violated his employment contract.

12   140.   Because of Codefendants' conduct, PWS/ Thompson Heath terminated

13   Mr. Khadivi's employment contract and did not pay Mr. Khadivi his bonuses.

14   141.   Upon belief and understanding, Codefendants have also approached

15   Mr. Khadivi's business contacts to inform them of the litigation with the intention

16   of interfering with Mr. Khadivi's ability to conduct his business.  Codefendants'

17   statements to members of the international insurance community have interfered

18   with Mr. Khadivi's ability to conduct business.

19   142.   As a result of Codefendants' intentional, wrongful conduct,

20   Mr. Khadivi has been damaged in an amount that will be proven at trial.  In

21   addition, Mr. Khadivi requests punitive damages in an amount to be determined at

22   trial.

23
### EIGHTH CLAIM FOR RELIEF
**(Negligent Interference with Prospective Economic Advantage against Codefendants)**

24

25   143.   Mr. Khadivi repeats and realleges the allegations contained in

26   paragraphs 1 through 91 above as though fully set forth herein.

27

28

1    144.  In January 2008, PWS/ Thompson Heath gave Mr. Khadivi a

2  Promissory Note, in which he was offered bonuses in exchange for his continued

3  employment with PWS/ Thompson Heath.

4    145.  Mr. Khadivi told Codefendants that PWS/ Thompson Heath gave

5  Mr. Khadivi the Promissory Note, and that he would continue working with PWS/

6  Thompson Heath so that he could collect the bonuses.

7    146.  In June 2008, Codefendants alleged to PWS/ Thompson Heath that

8  Mr. Khadivi violated his employment contract by signing the Consulting

9  Agreement with GBG.  By disclosing this information, Codefendants intended to

10  prevent Mr. Khadivi's continued employment with PWS/ Thompson Heath.

11  Codefendants knew with substantial certainty that if they disclosed the Consulting

12  Agreement to PWS/ Thompson, Mr. Khadivi would no longer be employed.

13    147.  Because of the allegations raised by Codefendants, PWS/ Thompson

14  Heath terminated Mr. Khadivi's employment contract and did not pay Mr. Khadivi

15  his bonuses.

16    148.  At Mr. Thorburn's direction, GBG filed a lawsuit in the United States

17  District Court for the Central District of California on June 29, 2009, with the

18  intention of using the legal process to disparage Mr. Khadivi's reputation.

19  Codefendants voluntarily dismissed that lawsuit on or about September 11, 2009.

20  Upon information and belief, Codefendants have approached several of

21  Mr. Khadivi's business contacts to inform them of the lawsuit with the intention of

22  interfering with Mr. Khadivi's business.

23    149.  It is reasonably foreseeable that making such statements to

24  Mr. Khadivi's business contacts would interfere with or disrupt Mr. Khadivi's

25  business relationships, and Codefendants acted recklessly by disseminating

26  information to specific members of the insurance community.

27    150.  As a result of wrongdoing on the part of Codefendants, Mr. Khadivi

28  has suffered damages in an amount that will be proven at trial.

1

2

## NINTH CLAIM FOR RELIEF
### (Defamation against Codefendants)

3

4

151.   Mr. Khadivi repeats and realleges the allegations contained in paragraphs 1 through 91 above as though fully set forth herein.

5

6

152.   Codefendants made false, unprivileged statements about Mr. Khadivi to his employers and business contacts.

7

8

153.   On or about May 31, 2008, Codefendants said to Mr. Hopkins that Mr. Khadivi could not be trusted.

9

10

11

12

154.   In June 2008, Codefendants approached Mr. Khadivi's employer, PWS/ Thompson Heath, and alleged that Mr. Khadivi lied to GBG regarding the amount of commissions earned related to GBG contracts.  Codefendants' statements directly injured Mr. Khadivi's professional reputation.

13

14

15

155.   As a result, Mr. Khadivi has suffered damages in an amount that will be proven at trial.  In addition, Mr. Khadivi requests punitive damages in an amount to be determined at trial.

16

17

## TENTH CLAIM FOR RELIEF
### (False Light against Codefendants)

18

19

156.   Mr. Khadivi repeats and realleges the allegations contained in paragraphs 1 through 91 above as though fully set forth herein.

20

21

157.   Codefendants have made false, unprivileged statements about Mr. Khadivi to his employers and business contacts.

22

23

158.   On or about May 31, 2008, Codefendants said to Mr. Hopkins that Mr. Khadivi could not be trusted.

24

25

26

159.   In June 2008, Codefendants approached Mr. Khadivi's employer, PWS/ Thompson Heath, and alleged that Mr. Khadivi lied to GBG regarding the amount of commissions earned related to GBG contracts.

27

28

160.   This portrayal of Mr. Khadivi would be highly offensive to a reasonable person, and caused Mr. Khadivi to suffer mental anguish.

1    161.  As a result of the false and harmful remarks made by Codefendants,

2    Mr. Khadivi has suffered damages in an amount that will be proven at trial.  In

3    addition, Mr. Khadivi requests punitive damages in an amount to be determined at

4    trial.

## ELEVENTH CLAIM FOR RELIEF
### (Unfair Business Practices against Codefendants)

7    162.  Mr. Khadivi repeats and realleges the allegations contained in

8    paragraphs 1 through 91 above as though fully set forth herein

9    163.  Knowing that Mr. Khadivi was no longer of any business use to GBG,

10    Mr. Thorburn realized he needed to regain the valuable equity stake Mr. Khadivi

11    held in GBG in order expand GBG and make GBG more desirable for potential

12    resale.

13    164.  Codefendants used Mr. Thorburn's close friendship with Mr. Khadivi

14    to fraudulently convince him to convey the GBG shares back to Mr. Thorburn.

15    Codefendants further engaged in activities that disparaged Mr. Khadivi and

16    damaged his reputation.  Finally, Codefendants set in motion a plan to ensure that

17    Mr. Khadivi would not be able to utilize his experience and expertise performing

18    underwriting services in China, because Codefendants feared that Mr. Khadivi

19    would assist Mr. Hopkins, Ms. Zhang and Shanghai Tai Kai as potential

20    competitors to GBG.

21    165.  As a result of the unfair and fraudulent acts by Codefendants,

22    Mr. Khadivi has suffered damages in an amount that will be proven at trial.

## TWELFTH CLAIM FOR RELIEF
### (Abuse of Process against Codefendants)

25    166.  Mr. Khadivi repeats and realleges the allegations contained in

26    paragraphs 1 through 91 above as though fully set forth herein.

27    167.  At Mr. Thorburn's direction, GBG filed a lawsuit in the United States

28    District Court in California on June 29, 2009, with the intention of using the legal

1   process to disparage Mr. Khadivi's reputation.  Codefendants voluntarily dismissed

2   the Complaint on or about September 11, 2009.

3        168.  Codefendants have indicated that the allegations of the GBG complaint

4   are true, when in fact they are not.

5        169.  Codefendants are using the litigation to disparage the reputation of

6   Mr. Khadivi.  Codefendants are using the United States legal system in an effort to

7   prevent or minimize Mr. Khadivi's ability to continue his work in the insurance

8   industry, the only field and area of expertise that he has developed over the more

9   than twenty years of his career.

10      170.  Codefendants' misuse and total disregard for the legal process has

11   caused Mr. Khadivi to sustain damages in an amount that shall be proven at trial.

12   In addition, Mr. Khadivi requests punitive damages in an amount to be determined

13   at trial.

**THIRTEENTH CLAIM FOR RELIEF**
**(Injunctive Relief against Codefendants)**

16      171.  Mr. Khadivi repeats and realleges the allegations contained in

17   paragraphs 1 through 91 above as though fully set forth herein.

18      172.  Codefendants continue to damage Mr. Khadivi's personal and

19   professional reputation on an ongoing basis.

20      173.  Mr. Khadivi does not have an adequate remedy at law, and will suffer

21   irreparable harm if Codefendants' actions are not enjoined.

22      174.  Mr. Khadivi requests that the Court issue a preliminary and permanent

23   injunction ordering Codefendants to refrain from individually or jointly engaging in

24   making any disparaging and harmful statements against Mr. Khadivi.

**FOURTEENTH CLAIM FOR RELIEF**
**(Declaratory Relief against Codefendants)**

27      175.  Mr. Khadivi repeats and realleges the allegations contained in

28   paragraphs 1 through 91 above as though fully set forth herein.

1   176.  An actual controversy has arisen and now exists as between

2   Mr. Khadivi, on the one hand, and Codefendants, on the other hand, concerning

3   their respective rights and obligations.

4   177.  Mr. Khadivi contends that Codefendants used false and fraudulent

5   means to obtain Mr. Khadivi's GBG shares and that he is entitled to compensation

6   for the value of his GBG shares.

7   178.  The Codefendants will contend that they are not required to

8   compensate Mr. Khadivi for his GBG shares, and that furthermore, Mr. Khadivi

9   breached the Consulting Agreement.

10   179.  A judicial declaration resolving this controversy is necessary and

11   appropriate at this time so that Mr. Khadivi may receive just compensation for his

12   8% of GBG shares.

## IV.   **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully demand judgment against

Codefendants, and each of them, as follows:

1.   For general damages, according to proof;

2.   For compensatory damages, according to proof;

3.   For equitable relief, according to proof;

4.   For punitive and exemplary damages in an amount appropriate to punish the Codefendants and deter others from engaging in similar misconduct as identified for the Fourth Claim for Relief, Sixth Claim for Relief, Seventh Claim for Relief, Ninth Claim for Relief, Tenth Claim for Relief, and the Twelve Claim for Relief;

5.   For preliminary and permanent injunctive relief against Codefendants;

6.   For a judicial determination and declaration of the parties' duties and obligations with respect to each allegation raised and whether or not Mr. Khadivi is entitled to any and all damages, including attorney's

1    fees and costs, suffered as a result of false and disparaging remarks

2    made by Codefendants;

3    7.    For attorney's fees;

4    8.    For costs of suit incurred herein; and

5    9.    For such other and further relief as the court may deem proper or just.

6

7    Dated:  September 14, 2009          JONES DAY

8

9                                       By:

10                                          Brian A. Sun

11                                       Attorneys for Plaintiff
                                         REZA KHADIVI

12

13

14   ## **DEMAND FOR JURY TRIAL**

15        Pursuant to Federal Rule of Civil Procedure 38(b) and Local Rule 38-1,

16   Plaintiff Reza Khadivi hereby demands a trial by jury on all issues triable in this

17   action.

18   Dated:  September 14, 2009          JONES DAY

19

20

21                                       By:
                                            Brian A. Sun

22                                       Attorneys for Plaintiff
                                         REZA KHADIVI

23

24

25

26

27

28

**Exhibit 1**



INCORPORATED UNDER THE LAWS OF THE STATE OF DELAWARE

# GLOBAL BENEFITS GROUP, INC.

TOTAL AUTHORIZED ISSUE
20,000 SHARES PAR VALUE $.01 EACH
COMMON STOCK

SEE REVERSE SIDE FOR
CERTAIN DEFINITIONS

This is to Certify that ___Ray Khadivi___

___Eighty (80)___ _____ is the owner of

non-assessable shares of the above Corporation transferable only on the books of
the Corporation by the holder hereof in person or by duly authorized Attorney
upon surrender of this Certificate, properly endorsed.

Witness, the seal of the Corporation and the signatures of its duly authorized officers.

Dated January 19, 2006

PRECISE CORPORATE PRINTING, N.Y.

**Exhibit 2**

THB Group plc

7

Massey House
Massey Road
Oakington
Kent BR8 3CY

Tel: 0870 761 7172
Fax: 0870 176 4088
www.thbgroup.com

Mr Ray Khadivi
5 Broadfields Avenue
Winchmore Hill
London N21 1AB

8 January 2005

### IRREVOCABLE PROMISSORY NOTE

Dear Ray

Subject only to:

i) completion of the purchase of the businesses and certain assets of PWS Holdings Plc, PWS International Limited and PWS Group Services Limited by THB Group Plc, THB International Holdings Limited and Thompson Heath and Bond Limited (the "Transaction"), and

ii) your acceptance of employment with the THB Group plc

we confirm that on 30 June 2006 (or if that is not a business day, the next business day), we will make an "Initial" payment to you of £412,600.

The terms of the "Subsequent" payments on 30 June 2009, and annually thereafter until 30 June 2012, shall be as set out in a separate document relating to the above "Transaction".

We confirm that your 2007 PWS profit-share, calculated at 40% of the Accident & Heath Division's gross profits for the financial year to 31st December 2007 (currently estimated at £352,000+) less the percentage which is allocated in accordance with normal practice to the PWS Group Services staff in Cheltenham  and an amount totalling £12,000 in respect of four members of staff in London will be paid to you in two equal instalments on 31st March and 30th September 2008, at a minimum of £50,000 each.  If either of these dates is not a business day then payment will be made on the next business day.

The above payments will be made to your usual UK bank account as notified to us from time to time, subject to any deductions of national insurance or income tax required by law.

33

We confirm that this agreement is governed by English law.



Signed as a deed by THB Group Plc          )
acting by Victor Thompson                  )
and Robert Wilkinson                       )

......................................................
Director

......................................................
Director

34

# Exhibit 3

## Consulting Agreement

By this an unconditional irrevocable Agreement between:

Ray Khadivi of 5 Broadfields Avenue, Winchmore Hill, London, U.K.(Khadivi), and

Global Benefits Group, Inc. (GBG) and Andrew Thorburn of 4 Mountain Laurel, Trabuco Canyon, CA, (Thorburn), the parties agree as follows:

1.      The purpose of this Agreement is to outline terms and conditions by which Khadivi will assist GBG with the set up, implementation and initial operations of its European affiliate, operating under the name Global Benefits Europe, (GBE), or similar name.

In pursing this objective the parties agree to work together to assist GBG in the following projects:

    a) the launch of GBE as an affiliate of GBG;

    b) employment of John White, Paul Horden and Rob Coss as employees of GBG/GBE;

    c) assignment of all current GBG business now placed through PWS to GBE, such placement to be on a net basis; that is, with no placement or broker fees paid to GBE;

    d) renewal of the existing GBG binders and reinsurance treaties under the terms outlined above, and their reassignment to GBE.

    e) retention by GBG of the brokerage and placement fees formerly due to PWS, effective April 1st 2008;

    f) modification of the health insurance binders such that the profit share to GBG shall be 50% of all underwriter profits after a 90% loss ratio to underwriting premium is achieved;

    g) renewal of all existing GBG business under such terms within its binding authority, as GBG may determine applicable to each case;

    h) Any other activity necessary to the proper launch and operation of the European affiliate of GBG.

2.      The parties agree to maintain a cooperative relationship with respect to future business activities and to refrain from any disparaging or derogatory statements regarding the other; this agreement shall extend to the employees, associates, and affiliates of the parties.

The parties further agree that the details of their business cooperation prior to, during and subsequent to the date of this agreement shall be confidential, and neither party shall share any such details with any individual or entity.

16/15                                                     Exhibit   6

3.     In consideration of Khadivi's stockholding and cooperation under this Agreement, GBG shall pay Khadivi a non-cancelable, irrevocable and unconditional consulting fee equal to $600,000 to be paid as follows:   $200,000 for the first 12 months after execution of this Agreement, and $100,000 annually for each of the next four years thereafter; all fees to be paid monthly beginning April 30, 2008, and continuing for 59 months thereafter.  Other than compliance with the provisions of this Agreement, this fee is not contingent on any specific performance by Khadivi, and the obligation to pay this fee shall be binding upon the successors and assigns of GBG.

Within 90 days of the sale of a majority interest in GBG to any party unaffiliated with Thorburn, the balance of the consulting fees due under this Agreement shall be paid to Khadivi in a lump sum.

4.     The parties acknowledge that there are no other written or oral agreements between the parties and any such prior agreements are hereby rendered null and void, including Khadivi's stockholding.

5.     In further recognition of Khadivi's stockholding in GBG, Thorburn shall also pay Khadivi further fees equating to any income GBG or GBE as a result of certain past TPA agreement or profit commissions.

6.     The parties shall use their best efforts to ensure that the effective date of the provisions of Paragraph 1 above shall be April 1st , 2008.

This agreement is governed by English law, and enforceable in both England and the United States of America.

Signed:


_Andrew Thorburn (signature)_ _____ April 15, 2008
Andrew Thorburn


_R. Khadivi (signature)_ _____ April 16, 2008
Ray Khadivi                           (date)

12/15

**ORIGINAL**

# UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
## CIVIL COVER SHEET

| I (a) PLAINTIFFS (Check box if you are representing yourself ☐) | DEFENDANTS |
|---|---|
| REZA KHADIVI | GLOBAL BENEFITS GROUP, INC., a California Corporation, ANDREW THORBURN, and Does 1 though 10, |

| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.) | Attorneys (If Known) |
|---|---|
| Brian A. Sun, JONES DAY, 555 S. Flower St., 50th Floor, Los Angeles, CA 90071 | Richard De La Mora<br>Richard Hopkins III<br>BARGER & WOLEN, 633 West 5th Street, Los Angeles, CA 90071 |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff   ☐ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant   ☑ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☑ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☑ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☑ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☑ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify):   ☐ 6 Multi-District Litigation   ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☑ Yes   ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes   ☑ No   **☑ MONEY DEMANDED IN COMPLAINT: $** 566,668

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
28 U.S.C. §1332 as this action involves a controversy between citizens of the United States and the United Kingdom and the amount in controversy exceeds $75,000.

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty | |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | BANKRUPTCY | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 480 Consumer Credit | ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 355 Motor Vehicle Product Liability | | FORFEITURE / PENALTY | PROPERTY RIGHTS |
| ☐ 810 Selective Service | | | CIVIL RIGHTS | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 875 Customer Challenge 12 USC 3410 | | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 890 Other Statutory Actions | ☐ 160 Stockholders' Suits | | ☐ 443 Housing/Acco-mmodations | | SOCIAL SECURITY |
| ☐ 891 Agricultural Act | ☑ 190 Other Contract | ☐ 365 Personal Injury-Product Liability | ☐ 444 Welfare | | ☐ 861 HIA (1395ff) |
| ☐ 892 Economic Stabilization Act | ☐ 195 Contract Product Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 445 American with Disabilities - Employment | ☐ 630 Liquor Laws | ☐ 862 Black Lung (923) |
| ☐ 893 Environmental Matters | ☐ 196 Franchise | | | ☐ 640 R.R. & Truck | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 894 Energy Allocation Act | REAL PROPERTY | | ☐ 446 American with Disabilities - Other | ☐ 650 Airline Regs | ☐ 864 SSID Title XVI |
| ☐ 895 Freedom of Info. Act | ☐ 210 Land Condemnation | IMMIGRATION | | ☐ 660 Occupational Safety /Health | ☐ 865 RSI (405(g)) |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 220 Foreclosure | ☐ 462 Naturalization Application | ☐ 440 Other Civil Rights | ☐ 690 Other | FEDERAL TAX SUITS |
| | ☐ 230 Rent Lease & Ejectment | ☐ 463 Habeas Corpus-Alien Detainee | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 240 Torts to Land | ☐ 465 Other Immigration Actions | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 245 Tort Product Liability | | | | |
| | ☐ 290 All Other Real Property | | | | |

**FOR OFFICE USE ONLY:** Case Number: CV094667 CAS (CTX)

SACV09-1062

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☐ No  ☑Yes
If yes, list case number(s):  CV094667 CAS (CTX)

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☐ No  ☑Yes
If yes, list case number(s):  CV09-4667 CAS (CTX)

**Civil cases are deemed related if a previously filed case and the present case:**
(Check all boxes that apply)   ☐ A. Arise from the same or closely related transactions, happenings, or events; or
                              ☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or
                              ☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or
                              ☐ D. Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.
☐    Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
|  | United Kingdom |

(b)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.
☐    Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Orange County<br>Orange County |  |

(c)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.
Note: In land condemnation cases, use the location of the tract of land involved.

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Orange County | United Kingdom<br>China |

\* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties
Note: In land condemnation cases, use the location of the tract of land involved

X. SIGNATURE OF ATTORNEY (OR PRO PER): _____   Date September 14, 2009

   **Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings
   or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed
   but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge David O. Carter and the assigned discovery Magistrate Judge is Robert N. Block.

The case number on all documents filed with the Court should read as follows:

## SACV09- 1062 DOC  (RNBx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

===============================================

## NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [_] **Western Division** | [X] **Southern Division** | [_] **Eastern Division** |
|---|---|---|
| 312 N. Spring St., Rm. G-8 | 411 West Fourth St., Rm. 1-053 | 3470 Twelfth St., Rm. 134 |
| Los Angeles, CA 90012 | Santa Ana, CA 92701-4516 | Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

Brian A. Sun (State Bar No. 089410)
basun@jonesday.com
JONES DAY
555 South Flower Street, Fiftieth Floor
Los Angeles, CA 90071-2300
Telephone: (213) 489-3939

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| REZA KHADIVI, | **CASE NUMBER** |
| PLAINTIFF(S) | **SACV09-1062 DOC (RNBx)** |
| v. | |
| GLOBAL BENEFITS GROUP, INC., a California Corporation, ANDREW THORBURN, and Does 1 though 10, | **SUMMONS** |
| DEFENDANT(S). | |

TO:    DEFENDANT(S): _____

A lawsuit has been filed against you.

Within ___20___ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff's attorney, _____Brian A. Sun_____, whose address is Jones Day, 555 S. Flower St., Fiftieth Floor, Los Angeles, CA 90071_____. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated:    SEP 1 4 2009                    By:    **LA'REE HORN**

Deputy Clerk

(Seal of the Court)

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].*

1192

CV-01A (12/07)                         **SUMMONS**

Brian A. Sun (State Bar No. 089410)
basun@jonesday.com
**JONES DAY**
555 South Flower Street, Fiftieth Floor
Los Angeles, CA 90071-2300
Telephone: (213) 489-3939

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| REZA KHADIVI,<br><br>PLAINTIFF(S)<br>v.<br><br>GLOBAL BENEFITS GROUP, INC., a California Corporation, ANDREW THORBURN, and Does 1 though 10,<br><br>DEFENDANT(S). | CASE NUMBER<br><br><br><br>**SUMMONS** |

TO:   DEFENDANT(S): Global Benefits Group, Inc.

A lawsuit has been filed against you.

Within __20__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff's attorney, _____ Brian A. Sun _____, whose address is Jones Day, 555 S. Flower St., Fiftieth Floor, Los Angeles, CA 90071 _____. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated: _____

By: _____
      Deputy Clerk

*(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].*